# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LABORERS' PENSION FUND, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Case No. 08 C 5232 |
| PARCO ASBESTOS REMOVAL CO., INC., | ) | |
| PAR CO., INC., OF ILLINOIS, INC., a | ) | Judge CONLON |
| dissolved Illinois corporation, and | ) | |
| A & E Services, Inc., an Illinois corporation, | ) | |
| and ROBERT NYKAZA, JR., individually, | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR ENTRY OF DEFAULT JUDGMENT IN SUM CERTAIN

NOW COME Plaintiffs, Laborers' Pension Fund and Laborers' Welfare Fund of

the Health and Welfare Department of the Construction and General Laborers' District

Council of Chicago and Vicinity, and James S. Jorgensen, (collectively "Plaintiffs" or the

"Funds"), by and through their attorney, Charles Ingrassia, and hereby move for Entry of

Default Judgment in Sum Certain against Defendants Parco Asbestos Removal Co., Inc.,

("Parco Asbestos"), Par Co., Inc., of Illinois, ("Par Co"), A & E Services, Inc., ("A & E

Services," and these entities will be collectively referred to as the "Companies"), and

Robert Nykaza, Jr., ("Nykaza") on Count III of the Plaintiffs' Complaint pursuant to Fed.

R. Civ. P. 54(b), and for an order of default on the remaining Counts of the Funds'

Complaint. In support of this Motion, the Plaintiffs state:

1.      The Funds filed their Complaint on September 12, 2008. Counts I and II

seek to compel Defendant Parco Asbestos to submit its books and records to an audit for

the period of September 1, 2005 forward to determine benefit contribution compliance

and union dues compliance, respectively. Count III seeks to recover amounts not paid pursuant to an Installment Note ("Note") signed by the Companies in the amount of $71,542.71 and a Guaranty of Payment and Idemnification ("Guaranty") signed by Nykaza, rendering him joint and severally liable for $45,501.74 of the amounts owed pursuant to the Note.

2.      Summons and Complaint were served on Defendant Parco Asbestos via corporate service on October 13, 2008. A true and accurate copy of the Affidavit of Service is attached hereto as <u>Exhibit A</u>. Summons and Complaint were served on Defendant Par Co via corporate service on October 13, 2008. A true and accurate copy of the Affidavit of Service is attached hereto as <u>Exhibit A-1</u>. Summons and Complaint were served on A & E Services via corporate service on October 13, 2008. A true and accurate copy of the Affidavit of Service is attached hereto as <u>Exhibit A-2</u>. Summons and Complaint were served on Defendant Nykaza via personal service on October 13, 2008. A true and accurate copy of the Affidavit of Service as to Nykaza is attached hereto as <u>Exhibit A-3</u>.

3.      The Companies and Nykaza have failed to file a responsive pleading and are in default. There is no just reason for delay and judgment should be entered against the Companies and Nykaza and in favor of the Funds pursuant to Fed. R. Civ. P. 54(b) on Count III of the Funds' Complaint.

4.  Pursuant to Section 502(g)(2) of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. § 1132(g)(2), Section 301 of the Labor Management Relations Act ("LMRA"), as amended, 29 U.S.C. §185, the Agreement, the

Funds' respective Agreements and Declarations of Trust, and the Note and Guaranty, the Funds are entitled to judgment in the amount of $72,960.71 on Count III as follows:

 A. As set forth in the Affidavit of Joe Gilleran, filed contemporaneously herewith and attached hereto as <u>Exhibit B</u>, $70,542.71 in unpaid benefit contributions and liquidated damages pursuant to the Note signed by the Companies; and $45,501.74 pursuant to the Guaranty signed by Defendant Nykaza; See <u>Exhibit B</u>, ¶ ¶ 5 and 6; and

 B. As set forth in the Declaration of Charles Ingrassia, filed contemporaneously herewith and attached hereto as <u>Exhibit C</u>, $2,418.00 in attorneys' fees and costs.

5. Defendant Parco Asbestos has also failed to submit its books and records to a requested audit for the period of September 1, 2005 forward. See <u>Exhibit B</u>, ¶ 7. Accordingly, the Funds request that Defendant Parco Asbestos be found in default on Counts I and II and be ordered to submit its books and records to an audit for the period of September 1, 2005 forward, with this Court setting a prove up date for those Counts in 60 days.

WHEREFORE, the Funds respectfully request:

 A. That judgment in the amount of $72,960.71 be entered in the Plaintiffs' favor and against Defendants Parco Asbestos Removal Co., Inc., Par Co., Inc., of Illinois, A & E Services, Inc., and Robert Nykaza, Jr., on Count III of the Funds' Complaint pursuant to Fed. R. Civ. P. 54(b) as follows:

(1.)     $70,542.71 entered against the Companies pursuant to the defaulted Note;

(2.)     finding that Defendant Nykaza is joint and severally liable for $45,501.74 of the amounts owed on the Note pursuant to the Guaranty; and

(3.)     $2,418.00 in attorneys' fees and costs entered against both the Companies and Nykaza pursuant to the terms of the Note and Guaranty.

B.     That Defendant Parco Asbestos be found in default as to Counts I and II and is ordered to submit its books and records to an audit for the period of September 1, 2005 forward.

C.     That this Court set a prove up date for Counts I and II of the Funds' Complaint in 60 days.

December 5, 2008                     Respectfully submitted,

                                    Laborers' Pension Fund, et al.

                                    By:  /s/ Charles Ingrassia

Charles Ingrassia
Office of Fund Counsel
111 W. Jackson Blvd., Suite 1415
Chicago, IL  60604
(312) 692-1540

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

**LABORERS' PENSION FUND, ET AL.**

PLAINTIFF(S)

vs.

**PARCO ASBESTOS REMOVAL CO., INC., ET AL**

DEFENDANT(S)

Case No.
**08 CV 5232**

SERVICE DOCUMENTS:
**SUMMONS & COMPLAINT**

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not party to nor interested in the above entitled action, and is competent to be a witness therein.

On **Oct 13, 2008**, at **6:30 PM**, I served the above described documents upon **PARCO ASBESTOS REMOVAL C INC.** as shown below:

**CORPORATE SERVICE** was made by leaving a true and correct copy of the documents with **ROBERT NYKAZA JR. / PRESIDENT**, an officer, managing agent or authorized agent of the within named company.

Said service was effected at **3 DEVONSHIRE CT, GRAYSLAKE, IL 60030.**

**DESCRIPTION:** Gender: **M**  Race: **WHITE**  Age: **65**  Hgt: **5'9"**  Wgt: **190**  Hair: **WHITE**  Glasses: **YES**

**COMMENTS: Robert Nykaza Jr. claims he is not the President of Parco Asbestos Removal Co., Inc.**

I declare under penalties of perjury that the information contained herein is true and correct.

_Katy E. Cartier_

**Katy E Cartier, Lic #: 117-001119**
**Judicial Attorney Services, Inc.**
**2100 Manchester Rd., Ste 900**
**Wheaton, IL 60187**
**(630) 221-9007**

SUBSCRIBED AND SWORN to before me this 16th day of October, 2008

_Joan C. Harenberg_

OFFICIAL SEAL
JOAN C HARENBERG
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/13/09

NOTARY PUBLIC

CLIENT NAME:
**Laborers Pension and Welfare Funds***
**FILE #:**

ORIGINAL PROOF OF SERVICE



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

**LABORERS' PENSION FUND, ET AL.**

PLAINTIFF(S)

vs.

**PARCO ASBESTOS REMOVAL CO., INC., ET AL**

DEFENDANT(S)

Case No.
**08 CV 5232**

SERVICE DOCUMENTS:
**SUMMONS & COMPLAINT**

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not party to nor interested in the above entitled action, and is competent to be a witness therein.

On **Oct 13, 2008**, at **6:30 PM**, I served the above described documents upon **PARCO., INC.** as shown below:

**CORPORATE SERVICE** was made by leaving a true and correct copy of the documents with **ROBERT NYKAZA JR. / PRESIDENT**, an officer, managing agent or authorized agent of the within named company.

Said service was effected at **3 DEVONSHIRE CT, GRAYSLAKE, IL 60030.**

**DESCRIPTION:**  Gender: **M**  Race: **WHITE**  Age: **65**  Hgt: **5'9"**  Wgt: **190**  Hair: **WHITE**  Glasses: **YES**

**COMMENTS:** Robert Nykaza Jr claims he is not the President of Parco, Inc.

I declare under penalties of perjury that the information contained herein is true and correct.

_Katy Cat_ (signature)

**Katy E Cartier, Lic #: 117-001119**
**Judicial Attorney Services, Inc.**
**2100 Manchester Rd., Ste 900**
**Wheaton, IL 60187**
**(630) 221-9007**

SUBSCRIBED AND SWORN to before me this 16th day of October, 2008

_Joan C. Harenberg_ (signature)

OFFICIAL SEAL
JOAN C HARENBERG
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/13/09

NOTARY PUBLIC

CLIENT NAME:
**Laborers Pension and Welfare Funds***
**FILE #:**

ORIGINAL PROOF OF SERVICE


EXHIBIT
A-1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

**LABORERS' PENSION FUND, ET AL.**

PLAINTIFF(S)

Case No.
**08 CV 5232**

vs.

**PARCO ASBESTOS REMOVAL CO., INC., ET AL**

DEFENDANT(S)

SERVICE DOCUMENTS:
**SUMMONS & COMPLAINT**

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not party to nor interested in the above entitled action, and is competent to be a witness therein.

On **Oct 13, 2008**, at **6:30 PM**, I served the above described documents upon **A & E SERVICES, INC.** as shown b

**CORPORATE SERVICE** was made by leaving a true and correct copy of the documents with **ROBERT NYKAZA JR. / PRESIDENT**, an officer, managing agent or authorized agent of the within named company.

Said service was effected at **3 DEVONSHIRE CT, GRAYSLAKE, IL 60030.**

**DESCRIPTION:** Gender: **M**  Race: **WHITE**  Age: **65**  Hgt: **5'9"**  Wgt: **190**  Hair: **WHITE**  Glasses: **YES**

**COMMENTS: Robert Nykaza Jr. claims that he is not the President of A & E Services, Inc.**

I declare under penalties of perjury that the information contained herein is true and correct.

**Katy E Cartier, Lic #: 117-001119**
**Judicial Attorney Services, Inc.**
**2100 Manchester Rd., Ste 900**
**Wheaton, IL 60187**
**(630) 221-9007**

SUBSCRIBED AND SWORN to before me this 16th day of October, 2008

*Joan C. Harenberg*

OFFICIAL SEAL
JOAN C HARENBERG
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 07/13/09

NOTARY PUBLIC

CLIENT NAME:
**Laborers Pension and Welfare Funds***
**FILE #:**

ORIGINAL PROOF OF SERVICE


EXHIBIT
A-2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

**LABORERS' PENSION FUND, ET AL.**

PLAINTIFF(S)

Case No.
**08 CV 5232**

vs.

**PARCO ASBESTOS REMOVAL CO., INC., ET AL**

DEFENDANT(S)

SERVICE DOCUMENTS:
**SUMMONS & COMPLAINT**

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not party to nor interested in the above entitled action, and is competent to be a witness therein.

On **Oct 13, 2008**, at **6:30 PM**, I served the above described documents upon **ROBERT NYKAZA, JR.** as shown below:

**PERSONAL SERVICE** was made by leaving a true and correct copy to the within named individual, **ROBERT NYKAZA JR.**.

Said service was effected at **3 DEVONSHIRE CT, GRAYSLAKE, IL 60030.**

**DESCRIPTION:** Gender: **M**  Race: **WHITE**  Age: **65**  Hgt: **5'9"**  Wgt: **190**  Hair: **WHITE**  Glasses: **YES**

I declare under penalties of perjury that the information contained herein is true and correct.

**Katy E Cartier, Lic #: 117-001119**
**Judicial Attorney Services, Inc.**
**2100 Manchester Rd., Ste 900**
**Wheaton, IL 60187**
**(630) 221-9007**

SUBSCRIBED AND SWORN to before me this 16th day of October, 2008

NOTARY PUBLIC

OFFICIAL SEAL
JOAN C HARENBERG
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/13/09

CLIENT NAME:
**Laborers Pension and Welfare Funds***
**FILE #:**

ORIGINAL PROOF OF SERVICE



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LABORERS' PENSION FUND, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 08 C 5232 |
| | ) | |
| PARCO ASBESTOS REMOVAL CO., INC., | ) | Judge CONLON |
| PAR CO., INC., OF ILLINOIS, INC., a | ) | |
| dissolved Illinois corporation, and | ) | |
| A & E Services, Inc., an Illinois corporation, | ) | |
| and ROBERT NYKAZA, JR., individually, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF JOE GILLERAN

JOE GILLERAN, being first duly sworn on oath, deposes and states as follows:

1.    I am a Field Representative employed by the Laborers' Pension Fund and the Laborers' Welfare Fund of the Construction and General Laborers' District Council of Chicago and Vicinity (the "Funds"), Plaintiffs in the above-referenced action.  My responsibilities include oversight of the collection of amounts owed by Defendants Parco Asbestos Removal Co., Inc, ("Parco Asbestos"), Par Co., Inc., of Illinois, ("Par Co"), A & E Services, Inc., ("A & E Services," and these entities will be collectively referred to as the "Companies"), and Robert Nykaza, Jr., ("Nykaza").  This Affidavit is submitted in support of the Funds' Motion for Entry of Default Judgment in Sum Certain pursuant to Fed. R. Civ. P. 54(b).  I have personal knowledge regarding the statements contained herein.

2.    On August 2, 1996, Defendant Parco Asbestos signed an Independent Construction Industry Collective Bargaining Agreement ("short form agreement") with



the Construction and General Laborers' District Council of Chicago and Vicinity ("District Council") and Laborers' Local Union No. 25. A true and accurate copy of the short form agreement is attached hereto as Exhibit B-1. Pursuant to the terms of the short form agreement, Parco Asbestos is bound to the terms of the relevant collective bargaining agreements incorporated by reference in the short form agreement ("Agreement(s)") and the Funds' respective Agreements and Declarations of Trust.

3. Pursuant to agreement, the Funds have been duly authorized to act as collection agents on behalf of the District Council for union dues owed to the District Council.

4. The Agreement and the Funds' respective Agreements and Declarations of Trust, to which Parco Asbestos is bound, require it to submit benefit and union dues reports and contribution payments by the tenth day of the following month. Benefits payments which are not received within thirty days of this date are assessed liquidated damages in the amount up to 20 per cent of the principal amount of delinquent benefits contributions, and interest at a rate of prime plus 2 per cent as charged by the JP Morgan Chase Bank from the date of delinquency forward. Dues payments which are not received within thirty days of this date are assessed liquidated damages in the amount of 10 per cent of the principal amount of delinquent dues contributions. A copy of the relevant portions of the Agreement is attached as Exhibit B-2; a copy of the relevant portions of the Amended Agreement and Declaration of Trust creating the Laborers' Pension Fund is attached as Exhibit B-3; a copy of the relevant portions of the Amended Health and Welfare Department of the Construction and General Laborers' District Council is attached as Exhibit B-4; and a copy of the Agreement and Declaration of Trust

2

Establishing the Construction and General Laborers' District Council of Chicago and Vicinity Training Trust Fund is attached hereto as Exhibit B-5.

5.     On or about May 31, 2008, the Companies entered into an Installment Note ("Note") with the Funds in the amount of $71,542.71 to pay all delinquencies owed to the Funds pursuant to two judgments obtained on February 9, 2005 and January 11, 2007, respectively, as well as other outstanding amounts owed to the Funds. A true and accurate copy of the Note is attached hereto as Exhibit B-6. On or about May 31, 2008, Defendant Nykaza signed a Guaranty of Payment and Idemnification ("Guaranty), guaranteeing payment of $45,501.74 due pursuant to the Note as well as all other amounts that become due to the Funds during the duration of the Note. The duration of the Note is from May 31, 2008 through September 1, 2010. A true and accurate copy of the Guaranty is attached hereto as Exhibit B-7. Accordingly, Defendant Nykaza is joint and severally liable to the Funds for $45,501.71 of the amounts owed pursuant to the Note and any additional amounts that become due and owing to the Funds during the duration of the Note.

6.     The Companies have defaulted on the Note by failing to make scheduled payments for the months of May 1, 2008 forward. Specifically, commencing on May 1, 2008, the Companies were scheduled to submit $1,250.00 to the Health and Welfare Fund per month and $1,250.00 to the Pension Fund per month. In June 2008, the Companies submitted $1,000.00 as a partial Note payment, but failed to pay the remaining balance despite repeated demands. The Companies also failed to pay their June 2008 forward Note payments, rendering the Note in default. Accordingly, the Companies owe the remaining balance of the defaulted Note, which is $70,542.71.

3

Finally, as stated above, Defendant Nykaza is joint and severally liable for $45,501.71 of the remaining Note balance pursuant to the terms of the Guaranty.

7. The Company has also failed to submit its books and records to a requested audit for the period of September 1, 2005 forward.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Joe Gilleran

Subscribed and sworn to before me this 4th day of December, 2008.

_____
Notary Public

"OFFICIAL SEAL"
EUGENIA MASHOS
Notary Public, State of Illinois
My Commission Expires 09/12/12

4



HEADQUARTERS OF

# Construction & General Laborers'
# District Council of Chicago and Vicinity

Affiliated with the Laborers International Union of North America, A. F. of L. — C. I. O. —

6121 WEST DIVERSEY AVENUE • CHICAGO, ILLINOIS 60639 • PHONE: 312-237-7537 • FAX: 312-237-3417

LOCALS 1, 2, 4, 5, 6, 25, 75, 76, 96, 118, 149, 152, 225, 269, 288, 582, 581, 1001, 1006, 1035, 1092

Joseph A. Lombardo, Jr.
Secretary-Treasurer

### MEMORANDUM OF JOINT WORKING AGREEMENT

Bruno Caruso
President
Business Manager

It is hereby stipulated and agreed by and between __PARCO ROBERTS__ herein called the "EMPLOYER", and the CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, herein called the "UNION", representing and encompassing Local Nos. 1, 2, 4, 5, 6, 25, 75, 76, 96, 118, 149, 152, 225, 269, 288, 582, 581, 1001, 1006, 1035, 1092, and encompassing the geographical areas of the counties of Cook, Lake, DuPage, Will, Grundy, Kendall, Kane, McHenry and Boone, in the State of Illinois, together with any other locals which may come within the jurisdiction of the UNION, that:

1. Employer, in response to the Union's claim that it represents an uncoerced majority of each Employer's laborer employee, acknowledges and agrees that there is no good faith doubt that the Union has been authorized to and in fact does represent such majority of laborer employees. Therefore, the Union is hereby recognized as the sole and exclusive collective bargaining representative for the employees now or hereafter employed in the bargaining unit with respect to wages, hours of work, and other terms and conditions of employment in accordance with Section 9 of the National Labor Relations Act without the need for a Board Certified Election.

2. The EMPLOYER affirms and adopts the Collective Bargaining Agreements between the UNION and the Builders Association of Chicago and Vicinity, the Concrete Contractors Association of Greater Chicago, the Illinois Road Builders Association, the Underground Contractors Association, Mason Contractors Association of Greater Chicago, Brick Paving and Gravel Reparation Contractors, G.D.C.N.I.C.A.W.C.C., Chicago Building Wreckers Association, Lumber Trade Association, Lake County Contractors Association, Lake County Paving Contractors Association and Sewer Contractor Association, Association of Wall and Ceiling Contractors of Lake County, and all other associations with whom the District Council or any of its affiliated local unions has a duly negotiated agreement, and re-establishes all agreements from June 1, 1976, together with all amendments thereto. It is further agreed that where a contractor works in the jurisdiction of any Local UNION, then the agreement of the local Union is herein specifically incorporated in this agreement and said agreement the standard District Council agreement in the case of any conflict between the District Council agreement and the local agreement having to do with wages, benefits, or conditions of employment. Nothing herein shall limit the jurisdiction of this agreement to less than that provided in this Memorandum of Agreement.

3. The EMPLOYER agrees to pay the amounts which he/she/it is bound to pay under any Collective Bargaining Agreements to the HEALTH and WELFARE DEPARTMENT OF CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, to the LABORERS PENSION FUND, and to the CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY TRAINING TRUST FUND and to become bound by and be considered a party to the Agreements and the Declarations of Trusts creating said Trust Funds as if he/she/it had signed the original copies of the Trust Instruments and amendments thereto. The EMPLOYER ratifies and confirms the appointment of the EMPLOYER Trustees who shall, together with their successor Trustees designated in the manner provided in said Agreements and Declaration of Trusts and jointly with an equal number of Trustees appointed by the UNION, carry out the terms and conditions of the Trust Instrument.

The EMPLOYER further affirms and re-establishes that all prior contributions paid to the Welfare, Pension and Training Funds were made by duly authorized agents of the EMPLOYER at the proper rates for the appropriate periods of time and that by making said prior contributions, the EMPLOYER empowers the same to be bound by the terms of the Trust Agreements and Collective Bargaining Agreements which were operative at the time the contributions were made, acknowledging the report form to be a sufficient instrument in writing to bind the EMPLOYER to the applicable agreements.

4. Employees covered by this Memorandum of Agreement shall mean all the work traditionally performed by laborers. The EMPLOYER agrees that he will not cause any such traditionally performed work to be done at a construction site by employees other than those covered by this Memorandum of Agreement, except with the prior written consent of the UNION. Any FMPLOYER who contracts out or sublets any of the work coming within the jurisdiction of the UNION shall assume the obligations of any subcontractor for prompt payment of employees' wages and other benefits, including reasonable attorneys' fees incurred in enforcing the provisions hereof. Notwithstanding any agreement to the contrary, the EMPLOYER's violation of any provision of this paragraph will give the UNION the right to take any other lawful action, including as remedies at law or equity.

5. In the event of any change in the ownership, management, or operation of the EMPLOYER's business by sale or otherwise, it is agreed that as a condition of such transfer or change it shall be provided in the instrument evidencing the change that the new owner and management shall be fully bound by the terms and conditions of this Agreement. This Agreement is applicable to all successors and transferees of the EMPLOYER, whether corporate or otherwise.

6. The negotiated wage and fringe benefit contribution rates in the various Collective Bargaining Agreements are as follows:

| | |
|---|---|
| June 1, 1995 | $20.55 Per Hour Wages |
| | $3.75 Per Hour Health and Welfare Fund |
| to | $1.45 Per Hour Pension Fund |
| | $ .10 Per Hour Training Fund |
| May 31, 1996 | $ .02 Per Hour MCIAF (or such amount as provided in local agreement) |
| | $ .01 Per Hour Chicagoland Safety Council (if applicable to local agreement) |
| | Dues Deductions are $.25 Per Hour for each hour worked unless notified of an increase. |
| | |
| June 1, 1996 | $1.00 Per Hour increase for the year June 1, 1996 through May 31, 1997 to be |
| to | allocated between wages and fringe benefits by the Union in its sole discretion. |
| | Welfare, Pension, and Training Funds to remain the same unless additional sums are allocated. |
| May 31, 1997 | MCIAF and Chicagoland Safety Council remain as above for the life of the contract. |
| | Dues Deductions are $.25 Per Hour unless notified of an increase. |
| | |
| June 1, 1997 | $1.00 Per hour increase for the year June 1, 1997 through May 31, 1998, to be allocated, |
| to | between wages and fringe benefits by the Union in its sole discretion. |
| | Welfare, Pension, and Training Funds to remain the same unless additional sums are allocated. |
| May 31, 1998 | MCIAF and Chicagoland Safety Council remain as above for the life of the contract. |
| | Dues Deductions are $.25 Per hour unless notified of an increase. |

All additional wage rate dues checkoff, or fringe benefit increases as negotiated after May 31, 1998, shall be incorporated in this Memorandum of Agreement.

7. Effective June 1, 1995, all EMPLOYERS covered by this Memorandum of Agreement incorporating the various Collective Bargaining Agreements shall deduct from the wages of employees covered by said contract, working dues in the amount of Twenty Five Cents ($.25) for each straight-time hour worked and Twenty-Five Cents ($.25) for each overtime hour worked, and shall remit monthly to the UNION offices designated to the EMPLOYER by the District Council the sums so deducted, together with an accurate list of employees from whose wages said dues were deducted and the amounts applicable to each employee, not later than the 15th day of the month following the month for which said deductions were made.

8. It is the intention of the parties that such deductions shall comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended and such deductions be made only pursuant to written agreements from each employee on whose account such deductions are made, which assignment shall not be irrevocable for a period of more than one year or beyond the termination date of the Memorandum of Agreement, whichever occurs sooner.

9. This Agreement shall remain in full force and effect through May 31, 1998 and shall continue thereafter unless there has been given written notice, by registered or certified mail by either party hereto received not less than 60 days and more than 90 days prior to the expiration date, of the desire to modify and amend this Agreement through negotiations. In the absence of such notice, the EMPLOYER and the UNION agree to be bound by the area-wide negotiated contracts with the various Associations, incorporating them into this Agreement and extending this Agreement for the life of the newly negotiated contracts.

10. The EMPLOYER acknowledges and accepts the facsimile signatures on the contract as if they were the original signatures. The EMPLOYER further acknowledges receipt of a copy of the complete Joint Working Agreement.

Dated at __CHICAGO__, this __02__ day of __August__ 19 __96__.

ACCEPTED:

Laborers' Local Union No. _____

By: _____

CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY

By: _____
Bruno Caruso, President/Business Manager

By: __Joseph A. Lombardo, Jr.__
Joseph A. Lombardo, Jr., Secretary-Treasurer

__PARCO Asbestos Removal Co__
(Employer)

By: __Robert Nyraca Jr   V-Pres__
(Name & Title)

__4403 W Lawrence__
(Address)

__Chicago__  __IL__  __60630__
(City)  (State)  (Zip Code)

__312  725  9900__
(Telephone)

TRUST FUND

EXHIBIT
B-1

JUNE 1, 2006 TO MAY 31, 2010

AGREEMENT

between the

ILLINOIS ENVIRONMENTAL
CONTRACTORS ASSOCIATION, INC.

and the

CONSTRUCTION AND GENERAL
LABORERS' DISTRICT COUNCIL
OF CHICAGO AND VICINITY
AND LABORERS LOCAL 225



EXHIBIT
B-2

# INDEX

| Article | | Page |
|---|---|---|
| | TERM OF CONTRACT | 1 |
| 1 | EQUAL OPPORTUNITY | 1 |
| 2 | PRE-BID/PRE-JOB CONFERENCE | 1 |
| 3 | HOURS AND OVERTIME | 2 |
| | Paragraph 1 | 2 |
| | Paragraph 2 | 2 |
| | Paragraph 3 | 2 |
| | Paragraph 4 | 2 |
| | Paragraph 5 – Regulatory Compliance | 2 |
| | Paragraph 6 - Breaks | 2 |
| | Paragraph 7 - Containment Work | 3 |
| | Paragraph 8 | 3 |
| | Paragraph 9 | 3 |
| | Paragraph 10 – Prevailing Wage Work | 3 |
| 4 | MULTIPLE SHIFTS | 3 |
| | Paragraph 1 | 3 |
| | Paragraph 2 | 3 |
| | Paragraph 3 | 3 |
| | Paragraph 4 | 4 |
| | Paragraph 5 | 4 |
| | Paragraph 6 | 4 |
| 5 | SUNDAYS, HOLIDAYS AND ELECTION DAYS.. | 4 |
| | Paragraph 1 | 4 |
| | Paragraph 2 | 4 |
| | Paragraph 3 | 4 |
| | Paragraph 4 | 4 |
| 6 | UNION SECURITY | 5 |
| 7 | CHECK-OFF & DUES DEDUCTIONS | 5 |
| | Paragraph 1 | 5 |
| | Paragraph 2 | 5 |
| | Paragraph 3 | 5 |
| | Paragraph 4 | 6 |
| | Paragraph 5 | 6 |

| **Article** | | **Page** |
|---|---|---|
| 8 | SUBCONTRACTING ...................................................... | 6 |
| 9 | WAGES ........................................................................ | 7 |
| | Paragraph 1 ................................................................. | 7 |
| | Paragraph 2 - Laborers Training Fund ......................... | 7 |
| | Paragraph 3 - Welfare ................................................. | 7 |
| | Paragraph 4 - Pension ................................................. | 8 |
| | Paragraph 5 - Supervisors ........................................... | 9 |
| | Paragraph 6 ................................................................. | 9 |
| | Paragraph 7 ................................................................. | 10 |
| | Paragraph 8 – Section 415 Excess Benefit Fund ......... | 10 |
| | Paragraph 9 ................................................................. | 10 |
| | Paragraph 10 ............................................................... | 10 |
| | Paragraph 11 ............................................................... | 11 |
| | Paragraph 12 – Out of Town Work .............................. | 11 |
| 10 | TRAINEE/HELPER AND APPRENTICES ................. | 11 |
| | Paragraph 1 - Trainee/Helpers. ................................... | 11 |
| | Paragraph 2 - Apprentice Program .............................. | 12 |
| | Paragraph 3 - Apprentice Committee ........................... | 12 |
| | Paragraph 4 - Apprentice Program Funding ................ | 12 |
| | Paragraph 5 ................................................................. | 12 |
| | Paragraph 6 ................................................................. | 13 |
| | Paragraph 7 ................................................................. | 13 |
| | Paragraph 8 ................................................................. | 13 |
| 11 | BONDING .................................................................... | 13 |
| 12 | INDUSTRY FUND ....................................................... | 15 |
| | Paragraph 1 ................................................................. | 15 |
| | Paragraph 2 ................................................................. | 15 |
| | Paragraph 3 ................................................................. | 15 |
| | Paragraph 4 ................................................................. | 16 |
| | Paragraph 5 ................................................................. | 16 |
| 13 | PARTICULAR WORK RULES AND CLARIFICATION OF CONDITIONS .................................................... | 16 |
| | Paragraph 1 ................................................................. | 16 |
| | Paragraph 2 ................................................................. | 16 |
| | Paragraph 3 ................................................................. | 16 |
| | Paragraph 4 ................................................................. | 17 |
| | Paragraph 5 ................................................................. | 17 |
| | Paragraph 6 ................................................................. | 17 |

| Article | | Page |
|---|---|---|

Paragraph 7- Sources for Hiring ...................................................17

| 14 | STEWARDS..................................................................17 |
| | Paragraph 1 ..............................................................17 |
| | Paragraph 2 ..............................................................18 |
| | Paragraph 3 ..............................................................18 |

| 15 | REPORTING FOR WORK................................................18 |
| | Paragraph 1 ..............................................................18 |
| | Paragraph 2 ..............................................................19 |
| | Paragraph 3 - Discipline for Quitting ...............................19 |

| 16 | PAYDAY......................................................................19 |
| | Paragraph 1 ..............................................................19 |
| | Paragraph 2 ..............................................................19 |
| | Paragraph 3 ..............................................................19 |

| 17 | BRANCHES OF WORK...................................................20 |
| | Paragraph 1 ..............................................................20 |
| | Paragraph 2 ..............................................................20 |
| | Paragraph 3 ..............................................................20 |
| | Paragraph 4 - Recognition of Bargaining Representative............20 |
| | Paragraph 4(a) - Scope of Work ......................................21 |
| | Paragraph 4(b) - Hazardous Waste ...................................21 |
| | Paragraph 4(c) - Lead Base Paint Abatement .......................21 |
| | Paragraph 4(d) ..........................................................22 |
| | Paragraph 5 - Use of Tools ............................................22 |
| | Paragraph 6 - Miscellaneous...........................................22 |

| 18 | ALCOHOL AND SUBSTANCE ABUSE ...............................22 |
| | Paragraph 1 ..............................................................22 |
| | Paragraph 1(a)...........................................................22 |
| | Paragraph 2 ..............................................................22 |
| | Paragraph 3 ..............................................................22 |
| | Paragraph 4(a)...........................................................22 |
| | Paragraph 4(b) ..........................................................23 |
| | Paragraph 5 ..............................................................23 |
| | Paragraph 6 ..............................................................23 |
| | Paragraph 7 ..............................................................23 |
| | Paragraph 8 ..............................................................23 |
| | Paragraph 9 ..............................................................23 |
| | Paragraph 10 ............................................................24 |
| | Paragraph 11 ............................................................24 |

| Article | | Page |
|---|---|---|
| | Paragraph 12 ................................................................ | 24 |
| | Paragraph 13 ................................................................ | 24 |
| | Paragraph 14 ................................................................ | 24 |
| | Paragraph 15 ................................................................ | 24 |
| | Paragraph 16 ................................................................ | 24 |
| | Paragraph 17 ................................................................ | 25 |
| | Paragraph 18 ................................................................ | 25 |
| 19 | ACCRETIONS AND SUCCESSORS ................................ | 25 |
| | (a) - Accretions ............................................................ | 25 |
| | (b) - Successors ........................................................... | 26 |
| 201 | ADJUSTMENTS OF DISPUTES ...................................... | 26 |
| | Paragraph 1. ................................................................. | 26 |
| | Paragraph 2. ................................................................. | 26 |
| | Paragraph 3 .................................................................. | 27 |
| | Paragraph 4 .................................................................. | 27 |
| | Paragraph 5 .................................................................. | 27 |
| | Paragraph 6 .................................................................. | 27 |
| 21 | MOST FAVORED NATIONS ........................................... | 27 |
| 22 | UNION PROTECTION .................................................... | 28 |
| 23 | APPROVALS ................................................................... | 28 |
| | Paragraph 1 .................................................................. | 28 |
| | Paragraph 2 - Savings Clause ....................................... | 28 |
| | Paragraph 3 - Employer=s Warranty ............................ | 28 |
| | Paragraph 4 - Execution ................................................ | 28 |
| | APPENDIX (Employer=s Bond) ..................................... | 30 |

# TERM OF CONTRACT

This AGREEMENT entered into this 1st day of June, 2006, for Cook, DuPage, Lake, Will, Grundy, Kendall, Kane, McHenry and Boone Counties by and between the ILLINOIS ENVIRONMENTAL CONTRACTORS ASSOCIATION, INC. (AAssociation@ or AIECA@), and all other Employers who sign a memorandum of Agreement assenting to be bound by this Agreement and CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY and its Local 225, hereinafter referred to as the UNION, shall remain in full force and effect until 11:59 p.m. May 31, 2010 and thereafter as modified through collective bargaining.

If either party wishes to modify this Agreement, it shall serve written notice by certified or registered mail, upon the other party not less than sixty days nor more than ninety days prior to May 31, 2010 of its intent to begin negotiations for a new Agreement. In the absence of the service of such notice, this Agreement shall automatically renew itself, together with all amendments and improvements as negotiated after said initial expiration date, by and between the parties in area-wide bargaining with the Midwest Regional Bargaining Association for the life of the newly negotiated contract.

In the absence of service of notice upon the Union by an Employer who is not a member of the IECA and who is a signator to a Memorandum assenting to be bound to this Agreement, said Employer shall automatically be bound to the terms of the newly negotiated or renewed Illinois Environmental Contractors Association, Inc. for the life of that contract.

## Article 1
## EQUAL OPPORTUNITY

The parties agree that Employees will not be discriminated against because of race, creed, religion, color, age, sex or national origin.

## Article 2
## PRE-BID/PRE-JOB CONFERENCE

Employer and Representatives of the Union are encouraged to hold a pre-bid-pre-job conference so that the start and continuation of work may progress without interruption. It shall be the purpose of the pre-bid/pre-job conference for the Employer and the Union to agree to such matters as the length of the job workweek and any shifts, subject to the provisions of Article 4; the number of men employed, the method of referral, appointment of a steward, hours in containment, the check-off of union dues and/or initiation fees, the applicable wage rates and fringe benefits contributions in accordance with the contract, and any other matters deemed necessary.

1

# Article 3
## HOURS AND OVERTIME

**Paragraph 1.** When one shift is used, eight (8) hours of work per day, from Monday through Friday, shall constitute the normal work day and straight time shall be paid. The Employer may also schedule four (4) consecutive days of ten (10) hours of work per day at straight time, between Monday and Friday, with prior written notice to the Union, and provided no violation of State or Federal law occurs.

**Paragraph 2.** Starting times may be adjusted by the Employer without notice to or approval by the Union.

**Paragraph 3.** At the option of the Employer, the starting time for the day, or the first shift can be flexible. It is the Employer's responsibility to inform the Employee of any change in starting time prior to quitting time the day before such change is to be effective. The first eight (8) hours' work shall be paid at straight time, the next 22 hours at time and one-half and double time thereafter.

**Paragraph 4.** Overtime rates on single shift work starting at 12:01 a.m. Saturday, shall be time and one-half for the first eight (8) hours of work, and thereafter double time shall be paid until 8:00 a.m. Monday; except that where an established shift (whether 8 or 10 hours) begins after 4:00 p.m. Friday and continues into Saturday, the first eight (8) hours shall be paid at straight time, the next two hours paid at time and one-half, and double time thereafter. All work performed on Sundays and holidays shall be paid at double time. Where the Employer's employees work four (4) consecutive days of ten (10) hours of work per day, the first ten (10) hours shall be paid at straight time, the next half (½) hour shall be paid and time and one-half, and double time thereafter.

**Paragraph 5. Regulatory Compliance.** Due to down time for regulatory compliance (limited to clean waiting periods and air monitoring/testing), ten (10) Saturdays per year may be used as a make-up day to be paid at straight time for the first eight (8) hours of work and double time thereafter, provided the Employer notifies and registers in writing with the Union at least 48 hours in advance. An Employer may provide less than 48 hours' advance notice where emergencies render timely notice impossible, but the Employer bears the burden of proof to establish such emergency. Make-up days for regulatory compliance shall not apply to employees working four (4) consecutive ten (10) hour workweeks.

The Employer's failure to register with the Union shall require premium pay for all Saturday work and the forfeiture of all future make-up days for the life of the Saturday agreement.

**Paragraph 6. Breaks.** Whether work is performed inside or outside of containment, employees shall receive one paid 15-minute break in the morning, a half hour unpaid lunch break

and one paid 15-minute break in the afternoon. The contractor may request permission of the Union to combine paid breaks and unpaid lunch, giving the employee a one-hour meal period, of which thirty (30) minutes shall be paid.

**Paragraph 7. Containment Work.** If an employee works in containment without taking lunch or the paid breaks, the employee shall be paid eight (8) hours= pay for six and one-half (6.5) hours= work and shall be relieved of any further work duty.

No hours for work performed in containment will be permitted if found to violate any state or federal statutes, regulations or guidelines.

**Paragraph 8.** Paid break time shall not be counted for purposes of calculating overtime, provided that such break time is not worked; lunch will be taken between the fourth (4th) and fifth (5th) hours of the work day. For example, an employee who commences working at 7:00 a.m. and who receives two 15-minute paid breaks (whether individually, or combined with the unpaid one-half hour lunch break) may be required to perform up to eight (8) hours of work and shall be paid eight and one-half hours pay at straight time for such eight (8) hours of work and one-half hour of paid break time. In this example, the employee=s meal period will occur between the hours of 11:00 a.m. and noon, and the employee=s work day will end at 4:00 p.m.

**Paragraph 9.** Employees scheduled to work four (4) consecutive ten (10) hour work days who work a minimum of five (5) hours on any work day shall be guaranteed ten (10) hours of work or pay at straight time on that day.

**Paragraph 10. Prevailing Wage Work.** Nothing in this Agreement is intended to, nor shall it be applied, so as to reduce wages below the minimums required under state and federal prevailing wage laws. In the event of a conflict, the established prevailing wages shall supersede the rates set forth in this Agreement.

# Article 4
# MULTIPLE SHIFTS

**Paragraph 1.** When it is necessary that the contractor use more than one shift for a period of three (3) or more consecutive days, the Union shall be notified twenty-four (24) hours in advance of the effective date of the starting of such multiple shift operations.

**Paragraph 2.** On Multiple Shift arrangements, the work week shall start at 12 o'clock midnight Sunday, and continue until 11:59 p.m. Friday. In no event shall regular working hours of different shifts overlap.

**Paragraph 3.** When three (3) eight (8) hours shifts are used, the employees shall receive

eight (8) hours' pay for seven and one- half (7½) hours worked; one-half paid hour being allowed for eating.

**Paragraph 4.** When two twelve (12) hour shifts are used, a paid eating period of one-half hour shall be allowed each shift and all time in excess of eight (8) hours worked shall be paid at the regular overtime rates, that is to say, and two and one-half (2½) hours immediately following the first eight (8) hours of work shall be paid for at the rate of time and one-half, and double time thereafter.

**Paragraph 5.** When two eight (8) hour or two ten (10) hour shifts are used, an eating period of one-half (½) hour shall be allowed, but not paid for, but all time in excess of eight (8) hours worked shall be paid at the regular overtime rates, as set forth in Paragraph 4 of this Article.

**Paragraph 6.** On Saturday, other than single time shift, shift work shall start at 12:01 a.m. and the first eight (8) hours of work each shift shall be paid for at the rate of time and one-half, and thereafter double time shall be paid; however, under no conditions shall more than eight (8) hours be worked at the rate of time and one-half on any one shift.

## Article 5
## SUNDAYS, HOLIDAYS AND ELECTION DAYS

**Paragraph 1.** All work performed on Sundays or on the following holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day, or on Mondays when such holidays are celebrated, shall be paid for at the double time rate. There shall be no work performed on Labor Day, excepting in case of dire emergency, and with the written consent of the President or Business Manager of the District Council.

**Paragraph 2.** On Election Days, the individual employed in this trade shall be allowed not to exceed two (2) hours' time without pay, for the purpose of voting, provided that the worker on the job has given notice to the Employer or his agent and has made arrangements no less than twenty-four (24) hours in advance, to receive such time off.

**Paragraph 3.** When a holiday falls on Monday through Friday, make-up day on Saturday shall be paid at time and one-half for the first eight (8) hours worked and double time thereafter.

**Paragraph 4.** In weeks that have designated holidays that fall during the regular workweek, but not more often than six (6) times per year, the Employer may schedule four (4) consecutive ten (10) hour days of work at straight time. The Union and the Employees must be informed and the Union must give permission to the Employer in writing.

4

# Article 6
## UNION SECURITY

All new Employees shall be required to join the Union after the expiration of seven (7) days of employment or seven (7) days after the execution date of this Agreement, whichever is later, and shall remain members of the Union in good standing as a condition of continued employment.

Good standing shall mean payment of the initiation fees and both working and non-working dues uniformly required as a condition of acquiring or retaining membership in a Local Union.

Employees covered by this Agreement at the time it is signed, and who are members of the Union at that time, shall be required as a condition of continued employment, to continue membership in the Union for the duration of this Agreement.

Employees covered by this Agreement at the time it has been signed, and who are not members of the Union at that time shall be required to join the Union seven (7) days after the date of execution of this Agreement and remain members of the Union in good standing for the duration of this Agreement.

# Article 7
## CHECK-OFF AND DUES DEDUCTIONS

**Paragraph 1.** Employers also agree to deduct from the net earnings payable to an Employee covered by this Agreement, initiation fees and quarterly Union dues insofar as permitted by State and Federal laws upon receipt and in accordance with a duly executed authorization form from the Employee. Said authorization form shall not be revocable for a period of more than one (1) year or prior to the termination date of this Agreement, whichever occurs sooner.

**Paragraph 2.** All Employers covered by this Agreement shall deduct from the wages of Employees covered by said contract, working dues approved by the Union for each hour worked and shall remit monthly to the Union office the sums so deducted, together with an accurate list of Employees from whose wages said dues were deducted and the amounts applicable to each Employee, not later than the 10th day of the month next following the month for which said deductions were made.

**Paragraph 3.** It is the intention of the parties that such deductions shall comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended, and that such deductions be made only pursuant to written assignments from each Employee on

whose account such deductions are made, which assignment shall not be revocable for a period of more than one (1) year, or prior to the termination date of this Agreement, whichever occurs sooner.

**Paragraph 4.** The Union agrees that it will indemnify and hold harmless the Employer from any and all claims, suits, causes of action, or otherwise, as regards the creation and administration of the dues check-off established by this Article, and such indemnity and agreement to hold harmless shall include the payment of costs and attorneys' fees on behalf of the beneficiaries of such indemnity.

**Paragraph 5.** Should the Employer fail to remit dues to the Union as required under this Agreement, the Employer shall be liable for and pay all costs of collection, including audit expenses and attorney fees and costs. Employers who fail to timely remit dues shall also be assessed an additional ten percent (10%) liquidated damages on the unpaid amounts.

## Article 8
## SUBCONTRACTING

Employers covered by this Agreement shall retain all work traditionally performed by Laborers. Employer agrees that he shall not subcontract any work traditionally performed at a construction site by any persons other than those covered by a collective bargaining agreement with the Laborers District Council of Chicago and Vicinity. Any Employer who contracts out or sublets any of the work coming within the jurisdiction of the Union shall assume the obligations of any subcontractor for prompt payment of employees' wages or fringe benefits including reasonable attorneys fees incurred in enforcing the provisions hereof. Employer's violation of any provision of this Paragraph will give the Union the right to take any lawful action, including all remedies at law or equity.

If an Employer, bound to this Agreement, contracts or subcontracts any work covered by this Agreement to be done at the jobsite of the construction, alteration, painting or repair of a building, structure or other work to any person or proprietor who is not signatory to this Agreement, the Employer shall require such subcontractor to be bound by all the provisions of this Agreement, or the Employer shall maintain daily records of the subcontractor's or the subcontractor's Employees jobsite hours and be liable for payments to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity, the Laborers' Pension Fund, and the Construction and General Laborers' District Council of Chicago and Vicinity Joint Apprentice and Training Trust Fund.

## Article 9
## WAGES

**Paragraph 1.** The rates of wages exclusive of fringe benefits to be paid in this trade for the period June 1, 2006 to and including May 31, 2010, shall be as set forth below for the respective following classification of asbestos laborer as defined herein: The wage rates include a total economic increase of $2.90 per hour effective June 1, 2006 to May 31, 2007 to be allocated between wages and fringe benefits by the Union in its sole discretion; June 1, 2007 to May 31, 2008, $3.00 per hour total economic increase to be allocated between wages, fringe benefits and other funds by the Union in its sole discretion; June 1, 2008 to May 31, 2009, $3.00 per hour total economic increase to be allocated between wages and fringe benefits by the Union in its sole discretion; June 1, 2009 to May 31, 2010, $3.10 per hour total economic increase to be allocated between wages, fringe benefits and other funds by the Union in its sole discretion. The foregoing allocations may include allocations to LECET and LDC/LMCC.

Containment Premium. If an employee works in containment without taking lunch or the paid breaks, the employee shall be paid eight (8) hours= pay for six and one-half (6.5) hours= work and shall be relieved of any further work duty.

Asbestos Laborer Foreman shall receive a minimum of Fifty ($.50) Cents wage premium over and above top Laborers' Scale under his supervision, except that in those cases for those Employers who have had a practice on or before July 15, 1991 of paying one ($1.00) Dollar to its Foremen as a premium over and above top Laborers' Scale, then such Employer shall continue to pay One ($1.00) Dollar to its Foremen.

Dosimeter Use A premium of One ($1.00) Dollar per hour shall be paid to any Laborer required to work with a dosimeter used for monitoring nuclear exposure.

**Paragraph 2. Laborers Training Fund**

The Training Fund contributions shall be seventeen cents ($ 0.17) per hour for each hour worked from June 1, 2006 to May 31, 2007, for all employees covered under this Agreement to the Construction and General Laborers District Council of Chicago and Vicinity Training Fund payable to the Training Fund or a designated appointee at the end of each month and such additional sums as the Union may designate in its sole discretion from its total economic package on June 1 of each year covered under this Agreement. The terms of the trust establishing the Fund are incorporated by reference herein and all terms regarding auditing, assessments, non-payments and grace periods as set out in the Collective Bargaining Agreement regarding payment of Welfare and Pension Fund contributions shall apply as if fully set forth herein for the Construction and General Laborers District Council of Chicago and Vicinity Training Fund.

**Paragraph 3. Welfare:** Beginning the period from June 1, 2006 to May 31, 2007, the

7

Employer agrees to make Health and Welfare contributions of $7.46 per hour for each hour worked by all Employees covered by this Agreement in addition to the wages herein stipulated. This $7.46 per hour shall be paid to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity or a designated appointee at the end of each month.

For the periods June 1, 2007 to May 31, 2008; June 1, 2008 to May 31, 2009; June 1, 2009 to May 31, 2010; that on May 1, if able but not later than June 1, the Union at its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article 9, Paragraph 1.)

**Paragraph 4. Pension:** Beginning June 1, 2004, the Employer agrees to make a pension contribution of $4.84 per hour for each hour worked by all Employees covered by this Agreement in addition to the wages and welfare payments herein stipulated. This $4.84 per hour shall be paid to the Laborers' Pension Fund or to a designated appointee at the end of each month.

For the periods June 1, 2007 to May 31, 2008; June 1, 2008 to May 31, 2009; June 1, 2009 to May 31, 2010; that on May 1, if able but not later than June 1, the Union at its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article 9, Paragraph 1.)

The parties agree that the Employer shall make separate checks for contributions to employee fringe benefit accounts and dues deductions, administered by the Trustees on behalf of each employee. It is further agreed that such contribution shall be accompanied by a breakdown of payment according to appropriate benefits.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether and to what extent benefits are to be provided for covered Employees.

The failure of the Employer to contribute to the said Welfare or Pension Funds when the same is established, as provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

A grace period of thirty (30) days shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during this grace period shall be assessed liquidated damages amounting to ten percent (10%) of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer acknowledges these

costs to be at a minimum of ten percent (10%), waiving the necessity of any additional proof thereof. In addition, the delinquent contributions shall bear interest at a maximum legal rate of interest per annum from the due date until they are paid.

Further, in the event the Trustees refer the account to legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of the examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement.

**Paragraph 5. Supervisors:** To the extent permissible by the Internal Revenue Service or any Federal Act, and for the purposes of Paragraphs 3 and 4 of Article 9 of this Agreement only, the bargaining unit shall also include those persons in the employ of an Employer who are supervisors, as defined in the Labor Management Relations Act, as amended; and who at one time were Employee members of the bargaining unit herein on whose behalf contributions were required to be made to the trust funds described in the aforesaid Paragraph 3 and 4 of Article 9 hereof.

**Paragraph 6.** Appointment of Trustees to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund. The parties agree that the Employer-appointed trustees of the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund and training and apprentice funds to which Employers are required to contribute shall be appointed solely by Employer associations that enter into collective bargaining agreements with the Union requiring contributions to such funds ("Signatory Associations"). It is further agreed that the Trust Agreements establishing such funds shall be amended to replace any Employer association that appoints a trustee and does not have a labor agreement with the Union, replacing it with a Signatory Association. The union and Signatory Associations shall meet within 30 days of the effective dates of agreements covering a majority of Fund participants to review the appointment of Employer Trustees of the funds. It is

9

agreed that the numbers of hours contributed by Employers represented by Signatory Associations compared to contributions by other Signatory Associations during the preceding year shall be the basis for assigning the number of trustee appointments. If such parties are unable to agree on the Signatory Associations to be responsible for appointments and the number of appointments to be made by each Signatory Association the dispute shall be submitted to expedited arbitration under Subpart D of the Policies and Procedures of the Federal Mediation and Conciliation Service.

**Paragraph 7.**  Article III Section 2 of the trust agreements of the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund shall be amended to include the following: "Association-appointed Trustees must be full-time employees of Contributing Employers within the Association's membership. A Contributing Employer shall be defined as an Employer that has employed an average of five (5) or more Laborers performing bargaining unit work for whom contributions have been made per month in each of the previous three (3) calendar years."

**Paragraph 8. Section 415 Excess Benefit Fund.**  A Section 415 Excess Benefit Fund shall be established for the purpose of providing alternative benefit to any employees of the Employer who become unable to receive the entire amount of the accrued pension benefits to which they would be entitled under one or more of the pension plans sponsored by their Employer because of limitations established by Section 415 of the Internal Revenue Code. The Employer may be required and directed by the Board of Trustees of the Excess Benefit Fund to contribute a portion of its agreed-upon "pension" contribution to the Section 415 Excess Benefit Fund and shall not increase the Employer's cost beyond the amount that the Employer is obligated to contribute to the Laborers' Pension Fund and that the funding of the Section 415 Excess Benefit Fund shall be fully tax deductible to the Employer for Federal Income Tax purposes. The Employer hereby agrees that the Board of Trustees of any such Section 415 Excess Benefit Fund shall be authorized to determine each year the amount that will be contributed by the Employer and the amount to be credited to the account of any eligible retiree for payment in lieu of accrued benefits that would exceed the limits set by Section 415 of the Internal Revenue Code.

**Paragraph 9.** The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Vacation Fund, a jointly-trusteed vacation plan established for the purpose of providing income to members during their winter layoffs. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

**Paragraph 10.**  The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Annuity Fund, a jointly-trusteed defined contribution plan providing a supplemental retirement benefit. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

**Paragraph 11. Special Rules for Bonding.** An employer that is owned or managed, in whole or part, by an individual who currently has or previously had in the last ten (10) years ownership or principal managerial responsibility for another contributing employer that currently is or ceased doing business when delinquent to the Funds shall be required to post for the benefit of the Funds an additional cash bond or obtain a surety bond from a Fund-approved insurer in an amount equal to twice the amount of the other contributing employer's delinquency. This amount may be adjusted by the Benefit Fund Trustees for each individual employer. This bond shall be in addition to and separate from the bond required elsewhere in this Agreement.

**Paragraph 12. Out of Town Work.** When Laborers who reside or work in the nine-county geographic area covered by this Agreement are asked to work at locations outside these nine counties, the Employer shall continue to report and pay benefits for all hours worked outside the nine counties. If the work performed is covered under a labor agreement with the Laborers' International Union of North America or its affiliates, the Employer shall report and pay the benefit contributions to the fringe benefit fund identified, and the contribution rates specified, under that labor agreement. If the work performed is not covered under a labor agreement with the Laborers' International Union of North America or its affiliates, then the Employer shall report and pay the benefit contributions to the fringe benefit funds identified, and the contributions rates specified, under this Agreement.

## Article 10
## TRAINEE/HELPER AND APPRENTICES

**Paragraph 1. Trainee/Helpers.** The Trainee/Helper rate shall be Sixty-six (66%) Percent of the base rate rounded up to the nearest penny plus full benefit contributions to the Laborers Health and Welfare and Pension Plans. After 800 hours of work in the industry, the rate shall be increased to eighty-five percent (85%) of the base rate rounded up to the nearest penny plus full benefit fund contributions. After 1600 hours work in the industry, the employee shall receive the full base rate plus full fringe benefit fund contributions. No present Laborer employee shall be replaced by a Trainee/Helper.

Employees with ten (10) or more Laborers will be allowed one (1) Trainee/Helper for every multiple of ten (10) Laborers per year. Said Trainee/Helper may work only 1600 hours in the construction industry which shall be cumulative among signatory Employers at the Sixty-six (66%) Percent rate or Eighty-five (85%) Percent rate, as applicable, after which time the Employee will become a full-rate Laborer, i.e. ten (10) Laborers - one (1) Trainee/Helper, twenty (20) Laborers - two (2) Trainee/Helpers, thirty (30) Laborers - three (3) Trainee/Helpers, etc.

Employers with three (3) to nine (9) Laborers will be allowed one (1) Trainee/Helper per year who may work only 1600 hours which shall be cumulative among signatory Employers at the appropriate rate (66% or 85%). Thereafter the Employee shall be compensated at the full

Laborers rate.

All Trainee/Helpers must be registered with the Laborers District Council and the Training Fund. Upon inquiry by the Employers at time of registration, the Training Fund shall notify Employer of the number of hours accumulated by the Trainee/Helper in the industry. Any Trainee/Helper not registered shall receive the full Laborers rate. Violation of the above-stated ratios of Trainee/Helpers to Laborers will result in the Employer's forfeiture of the right to utilize Trainee/Helpers for one year.

All Health and Welfare, Pension, Industry and Trainee/Helper Fund contributions will commence immediately upon employment. Union affiliation will be required after seven (7) days of employment.

The Employer shall report monthly to the Training Fund the hours worked by each Trainee/Helper and the wages paid for such work.

**Paragraph 2. Apprentice Program.** In lieu of the Trainee/Helper Program provided for in Section 1, the Illinois Environmental Contractors Association, on behalf of the Employers covered under this Agreement, may elect in writing to participate in the Apprentice Program, described below. The Trainee/Helper Program and the Apprentice Program are mutually exclusive, and once the Association elects to participate in the Apprentice Program, Section 1 will be null and void, and no Employer shall be permitted thereafter to employ any Trainee/ Helper.

**Paragraph 3. Apprentice Committee:** The Employer hereby agrees that the Joint Apprenticeship Training Committee (JATC) shall have the authority to establish rules for the apprentice program, including penalties for violations of the apprenticeship rules, which are incorporated herein by reference.

**Paragraph 4. Apprentice Program Funding:** The apprenticeship program administered by the JATC shall be self sustaining. In addition to the sums set forth in Article 9, Paragraph 2 of the Agreement, effective on the date when the Association elects to participate in the program, the Employer shall also contribute to the Training Fund an additional contribution of five cents ($.05) per hour for each hour worked by all employees covered by this agreement, or a lesser amount as may be determined by the JATC. Effective on the date when the Association elects to participate in the program, the contribution shall be increased as determined by the JATC, but in no event shall the aggregate contributions under this paragraph 2 exceed five cents ($.05) over the term of this Agreement.

**Paragraph 5.** The term of apprenticeship shall be 2,400 hours, or two years, whichever occurs later. All Health and Welfare, Pension, Training Fund, Industry Advancement and other contributions required under this Agreement will commence immediately upon employment of an apprentice. Union affiliation will be required after seven (7) days of employment.

**Paragraph 6.** The wages per hour paid to apprentices shall be as follows:

| | |
|---|---|
| 1st six (6) months: | 60% of journeyman (base) wages |
| 2nd six (6) months: | 70% of journeyman (base) wages |
| 3rd six (6) months: | 80% of journeyman (base) wages |
| 4th six (6) months: | 90% of journeyman (base) wages |
| After 24 months: | 100% of journeyman (base) wages |

**Paragraph 7.** The ratio of journeymen to Apprentices shall be six (6) laborer journeymen to one (1) laborer apprentice on a company-wide basis, with no more than twenty percent (20%) of laborers being apprentices on any one job site of the Employer. Employers who employ a maximum of between one (1) and five (5) laborer journeymen shall be entitled to one (1) laborer apprentice, who may be assigned to job sites irrespective of the twenty percent (20%) job site maximum specified in this provision.

**Paragraph 8.** Referral of apprentices will be through the Local Union with jurisdiction over the job site. Employers requesting apprentices will be assigned an apprentice from the available JATC apprentice pool. The JATC can limit the number of apprentices to that which is adequate for current needs and which can be properly trained by the program. Employers may recall their laid off apprentices to work, provided that the Employer complies with the ratios set forth in Paragraph 5. All apprentices must report their hours weekly to the JATC. All apprentices will be tested for the presence of illegal substances at the time they enter the apprentice program.

If any Employer violates the provisions of this Article, it shall lose its right to employ Trainee/Helpers and Apprentices for one (1) year.

## Article 11
## BONDING

(a)(i) Each Employer agrees that before commencing any work to which this Agreement applies, a performance bond in the sum of Fifty Thousand Dollars ($50,000.00) shall be provided to insure the prompt and full payment of all wages, fringe benefit contributions due to the Welfare Fund, Pension Fund, and Training Fund, and Industry Education Fund contributions. Such bond, which shall be in the form appended hereto as the Appendix, shall:

(1) be written by an insurance carrier with reserves in excess of One Million Dollars ($1,000,000.00) authorized, licensed, or permitted to do business in the State of Illinois; or

(2) be secured by a cash deposit of the full amount of such bond in an account maintained jointly by the Trustees of the four (4) funds; or

13

(3) be secured by other assets of personal sureties accept able to the Trustees which equal or exceed in value the full amount of the bond; or

(4) be secured by any combination of (1), (2) and/or (3) above; and

(5) be payable to the Trustees of the respective funds, as their interest may appear, in the event Employer fails to make prompt and full payment of his fringe benefit fund contributions.

If for any reason the amount of value of the security provided by the Employer should decrease below the amount specified above, the Employer agrees to provide such additional security as may be necessary to restore it to the proper sum upon written request of the Trustees of any of the funds.

(a)(ii) The Association shall have the right to satisfy on behalf of its members, or any of them, the bonding requirement of paragraph (a)(i) above by the posting of a blanket bond in the amount of not less than Two Hundred Fifty Thousand Dollars ($250,000.00) If any ASSOCIATION member is excluded from such bond, or if any Employer previously covered by such bond ceases to be eligible for coverage because of the cessation of its ASSOCIATION membership, the ASSOCIATION shall notify the Union and the respective funds of such exclusion in writing; bond coverage for the excluded member or Employer shall continue for sixty (60) days following receipt of such notice.

(a)(iii) In the event an Employer fails for any reason to satisfy the bonding requirements of paragraph (a)(i) above, the Employer shall be personally liable to the funds named in paragraph (a)(i) in the amount of Fifty Thousand Dollars ($50,000.00) plus all unpaid amounts in excess of that sum which are due the funds by that Employer. In the event the Employer is a corporation, liability under this paragraph shall be imposed not only on the corporation, but also personally on each corporate official of that Employer empowered to execute agreements or sign checks on the corporation's behalf, or to designate the persons empowered to execute agreements or sign checks on the corporation's behalf, or to designate the persons empowered to do so. The provisions of this paragraph shall in no way relieve or excuse any Employer of the obligation to provide the bond described in paragraph (a)(i) above, nor shall this provision limit the personal liability of said corporate officers based on operation of law.

(a)(iv) Any Employer commencing work in violation of the requirements set forth above shall be in violation of the requirements set forth above shall be in violation of the fringe benefit fund contribution payment provisions of this Agreement.

(a)(v) The Union and/or the Fringe Benefit Funds may enforce the bond obligations set forth in this Article and collect the bond proceeds. The attorneys fees and costs enforcing the bond obligations under this Article shall be charged to and paid by the Employer, but shall not be

14

taken from the proceeds of the bond.

(b)  The Employer shall give notice to the Union and the appropriate fund offices in writing not later than ten (10) days after the occurrence of any of the following events relating to the Employer, occurring after the date hereof:

(1)     Formation of Partnerships;
(2)     Termination of business;
(3)     Change of name commonly used in business operation;
(4)     Change in form of business organization;
(5)     Incorporation of business;
(6)     Dissolution of corporation;
(7)     Name and business organization of successor;
(8)     Admission to or withdrawal from any association operation as a multi-employer bargaining unit.


### Article 12
### INDUSTRY FUND

**Paragraph 1.**  Effective June 1, 2006, each Employer shall pay into the Industry Education Fund the amount of $.12, or such lesser amount as the Association shall specify in writing to the Union, for each hour worked for the Employer by those of his Employees covered by this Agreement.  An Employer shall make the Industry Education Fund payments at the same time and in the same manner as payments to the Laborers Training Fund, and the Union will promptly deposit the Industry Education Fund payments in a depository as directed by the Illinois Environmental Contractors Association, Inc. and will provide to the Association a report showing for each Employer the hours worked and the amount of the payment made.

**Paragraph 2.**  The Industry Education Fund shall be used by the Illinois Environmental Contractors Association, Inc. for office and administrative expenses, collective bargaining, contract administration, promotion of the asbestos and lead abatement industry, educational programs, and related activities in accordance with the Association's Constitution and By-Laws, provided that the Industry Education Fund shall not be used to oppose the Union's efforts to organize workers in the asbestos and lead abatement industry, to finance any legal action against the Union, or for political activity.

**Paragraph 3.**  Inasmuch as the existence and utilization of the Industry Education Fund should result in increased employment and, therefore, in increased job opportunities for Employees, the Union agrees to cooperate in assuring that the contributions required by this Article are in fact made by Employers bound by this Agreement.  If an Employer fails to make the payments required by this Article within thirty days following notice of default, the

Association may commence an action against such Employer in any court having jurisdiction over the parties and the subject matter to collect the unpaid amount, plus attorney's fees, court costs, interest on the unpaid amount at the rate of 1% per month from the date when the payment was initially due until the date when it is received, and liquidated damages in the amount of 10% of the unpaid amount.

**Paragraph 4.**  Effective June 1, 2006, each Employer shall pay the amount of five cents ($0.05) for each hour worked by those employees covered under this Agreement to the Chicago-Area Laborers-Employers Cooperation Education Trust ( LECET ).  If an Employer defaults in paying this contribution, the Trustees may pursue the same remedies as are specified in Paragraph 3 above.

**Paragraph 5.**  Effective June 1, 2006, each Employer shall pay the amount of twelve cents ($ .12) per hour for each hour worked by those employees covered under this Agreement to the Laborers= District Council Labor Management Cooperation Committee (ALDC/LMCC®).  If an Employer defaults in paying this contribution, the LDC/LMCC trustees may pursue the same remedies as are specified in Paragraph 3, above.  Effective June 1 of each year during this Agreement, the Union may in its sole discretion apportion from the total economic increase an additional amount to be applied to the LDC/LMCC.

## Article 13
## PARTICULAR WORK RULES AND
## CLARIFICATION OF CONDITIONS

**Paragraph 1.**  At the option of the Employer, wages shall be payable in the United States Currency or by check.  Failure on the part of the Employer to have sufficient funds in the bank to meet pay checks issued workers, shall deprive such Employers henceforth from the right to pay by checks.

**Paragraph 2.**  The Union agrees that the Employees whom it represents will accept and demand the wages and fringe benefit payments set forth in this Agreement, and the Employer agrees to pay the wages and fringe benefit payments herein stipulated.

**Paragraph 3.**  Payment by the Employer and acceptance by the Employee of less than the wage herein stipulated shall be a violation of this Agreement upon the part of each.  Upon conclusive proof of such violation, the Employer shall immediately pay the unpaid balance due in accordance with the wage herein stipulated and a penalty of fifty (50%) percent of the amount of such pay shortage as just and liquidated damages because of such violation.

Upon conclusive proof that the Employer is guilty of paying less than the wages herein stipulated, then nothing in this Agreement shall be construed to take from the Union the right to remove workers it represents from the job, and henceforth to deny such Employer further right to

16

the employment of its members.

**Paragraph 4.** The Union reserves and shall have the right to remove its men from any job upon the failure of the Employer to pay the wages due any of its Employees or fringe benefits which may be due by reason of the hours of employment.

**Paragraph 5.** The Employer hereby agrees to maintain proper temporary toilet and drinking facilities accessible to all Employees on the job and to comply with all OSHA, E.P.A., State and Federal guidelines covering such work.

**Paragraph 6.** The Employer shall furnish a suitable place, properly heated when reasonably necessary, where Laborers may eat and change their clothes.

**Paragraph 7. Sources For Hiring:** When the Employer needs additional employees, he shall give the Local 225 equal opportunity with all other sources to provide suitable applicants, but the Employer shall not be required to hire those referred by Local 225 and neither the Laborers' District Council or Local 225 is an exclusive hiring hall. In those instances where an Employer may contact Local 225 for referrals, Local 225 shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in Local 225, and such selection and referral shall not be affected in any way by rules, regulations, bylaws, constitutional provisions or any other aspect or obligation of Union membership, polices or requirements. All such referrals shall be in accordance with the following procedure:

(1)     The person must be an asbestos abatement laborer licensed by the State of Illinois or possess such skill and experience as would qualify for license;

(2)     The referral shall be made by chronological listing by date of registration with Local 225. However, when the Employer makes a special request for former employees, or specifically named individuals, Local 225 will attempt to honor such request.

### Article 14
### STEWARDS

**Paragraph 1.** In order to secure observance of the provisions of this Agreement, each job shall have a Steward who shall be the second man on the job. Such Steward shall be subject to the same terms of employment as any other employee, but taking into consideration that the Steward should be present during all working hours, all possible overtime work shall be assigned to all Stewards, if the Stewards do not replace another employee from that other employee's previously assigned duties.

The Union shall attempt to appoint a Steward from among the Employer's existing work

force. If, in the Union's discretion, it cannot select a suitable Steward from among the Employer's existing work force, or if it is no longer satisfied with the present Steward, it shall refer a Steward to the job. Any Steward referred to a job must be properly licensed, must pass a physical examination if required of all other newly-hired employees, and must be able to perform the Employer=s required work to the same extent as all other employees. In addition, any Steward referred to a job must be certified by the Union under its Steward training program. In referring a Steward to a job, the Union will give due consideration to the residency requirements or hiring goals which may apply to the job under local, state or federal law.

A Steward who is transferred by an Employer to another job will be regarded as a suitable Steward if the Employer or the Steward promptly notifies the Union of the transfer and the Union does not object to such person's serving as Steward on the job. If a violation of this paragraph occurs, an appropriate remedy shall be determined through the grievance procedure.

**Paragraph 2.** The duties of the Steward shall include the checking of terms and conditions of work, safety conditions, starting dates of employment for new Laborers, whether Union or Non-Union, and the reporting of same to the Business Representative who appointed him. All Laborers employed on a job or project shall report to the Steward any differences or disputes which may arise in connection with the work or any part of it, and the Steward shall report same to the office of the Union. If it becomes necessary to discharge or lay off any Laborers because of completion of the work or otherwise, the Laborer appointed and acting as Steward shall not be discharged or laid off while other Laborers remain employed on the job or project as long as he is competent to perform the work. Nothing herein contained shall in any way restrict the right of any Employer to discharge a Steward for cause, upon notification to the Business Agent of the Local Union who appointed the Laborer to act as Steward.

**Paragraph 3.** Whenever one or more Laborers are required to work overtime, one of these Laborers shall be the regular designated Steward if he is competent to do the work required, or if he cannot work, he will call the Business Manager, and the Business Manager will designate someone on this job to act as Steward.

### Article 15
### REPORTING FOR WORK

**Paragraph 1.** Any Laborer reporting for work upon order expressed or implied by the Employer or his Agent and not put to work for any reason, except weather conditions, fire, accident or other unavoidable cause, shall receive 2 hours' pay; if the Laborer is put to work, he shall receive 4 hours pay; if he works in excess of 4 hours, and is then sent home, he shall be paid for 8 hours if he is prevented from completing a full days work because of circumstances beyond the control of the Employer.

**Paragraph 2.** In case of an accident requiring medical attention during working hours,

Laborers shall be permitted to go for or be taken for medical attention at once, and shall be paid for lost time that day.

In the event such injured Laborer is permitted to continue working by the doctor, but is required to return for periodic medical attention during working hours by the insurance physician or company doctor, such injured Laborer shall be paid for lost time, but not to exceed two (2) hours' pay for such visit to the doctor.

**Paragraph 3. Discipline For Quitting:** Any Employee who leaves his employment without giving the Employer or his agent notice during the previous shift, shall be subject to discipline.

The Employer agrees that no punitive action shall be taken against its Employees, if said Employees refuse to cross a picket line that may be placed on the job or project of their Employer.

## Article 16
## PAYDAY

**Paragraph 1.** It is agreed that Employees shall be paid before quitting time on Friday of each week, except when the regular payday is on a Legal Holiday, in which case they shall be paid the day before such holiday at quitting time, and except when Monday and Tuesday is a legal holiday, in which event the Employees may be paid on Thursday.

**Paragraph 2.** Wages are to be paid in full up to seventy-five (75) hours preceding payday. An Employee quitting of his own accord shall be paid on the next regular payday. An Employee discharged or laid off shall be paid in cash or check on the job at the time he is laid off or be given a time check calling for four (4) additional hours to cover traveling time. Such additional hours are to be added at the time of giving check and shall be paid on presentation at the office of the Employer. If same is not promptly paid upon arrival at the office and he is required to remain there during working hours, he shall be paid for such time -Sundays and Holidays excepted.

**Paragraph 3.** Employers who observe a different practice regarding pay day from that set forth in Paragraphs 1 and 2 above may continue to observe that practice.

## Article 17
## BRANCHES OF WORK

**Paragraph 1.** The classifications of Employees covered by this Agreement doing the work falling within jurisdiction of this Union shall be used in performing all common labor at the building or site, in connection with asbestos and hazardous waste abatement or removal or such other work as may be directed by the Employer, his foreman or agent.

**Paragraph 2.** The Employer shall not engage his laborer on a piece-work basis.

**Paragraph 3.** The Employer shall furnish all necessary protective equipment, respirators, and air quality testing devices.

Employer shall furnish each laborer with the following tools:
- 1 claw hammer
- 1 flat head screwdriver
- 1 Phillips screwdriver
- 1 utility knife
- 1 tin snip
- 1 tape measure

Employees must maintain these tools and bring them with them upon reporting to work. A failure to report to work with the proper tools to perform the work which results in the Employer's determination that the person is unable to perform that day's work may result in a one day suspension. The suspended employee will not receive show up time. The responsibility to replace the tools is solely that of the Employer.

If Employer performs any other work falling with the traditional jurisdiction of the Laborers' Union, Employer shall be bound to the terms of the agreement covering such work, but that agreement shall not be used to reduce wages or benefits of work covered under this Agreement.

**Paragraph 4. Recognition Of Bargaining Representative:** The Employer, in response to the Union=s request for recognition as the majority 9(a) representative of its Laborer employees, and the Union=s demonstrated evidence of its majority support, hereby recognizes the Union under Section 9(a) of the Act as the sole and exclusive collective bargaining representative for the employees now and hereafter employed in the bargaining unit with respect to wages, hours and other terms and conditions of employment without the need for a Board-certified election.

Employer also confirms the jurisdiction of this Union over the branches of work covered herein, and agrees not to enter into any agreement with other labor organizations covering such

branches of work.

**Paragraph 4(a). Scope Of Work:** The branches of work covered by this Agreement are: asbestos, abatement laborer duties including all tasks related to asbestos abatement or removal. This includes, but is not limited to the handling, removal, abatement, or encapsulation of asbestos and/or toxic or hazardous waste or materials. It shall include the following: loading, unloading, erection, moving, servicing, and dismantling of all enclosures, barricades, chambers, scaffolding or decontamination units required for the removal, control, or containment of asbestos or clean up on the job or project site: the operation of all tools and equipment: including, but not limited to, generators, compressors, and vacuums used in the removal and abatement of toxic or hazardous waste or materials; the labeling, bagging, cartoning, crating or otherwise packaging of materials for disposal, the clean up of work site and all other work incidental to the handling, removal, control, abatement, disposal and/or encapsulation of asbestos and/or toxic or hazardous waste or materials. All of the described work shall be performed by the asbestos abatement laborer in conformance with all applicable federal, state, and municipal statutes, regulations, ordinances and standards.

**Paragraph 4(b). Hazardous Waste:** The duties include clearing brush and trees, installing fence and erosion curtains, building dikes with sandbags and/or soil and lining with plastic materials, site cleaning such as removal of steel, wood, trash, etc; locating buried lines, sewer, and drums, and establishing their condition; overpacking, applying absorbants to leaking material, handling and rigging of all materials and general clean-up of leaked materials and chemicals; opening sample drums, label and transfer bulk liquids from drums into other containers. The Laborers are responsible for decontamination of all tools, equipment, and personnel on site; lining truck beds with plastic, operating pumps and equipment necessary to drain or fill ponds, lagoons, and slurry walls.

**Paragraph 4(c). Lead-Based Paint Abatement:** The abatement and disposal of Lead-Base Paint is an environmental and occupational hazard and not a preparation for painting. The members of the Laborers' International Union of North America claim all the work related to the abatement and disposal of Lead-Base Paint on both exterior and interior structures.

The duties include all work in connection with the handling, control, removal, stripping, abatement, encapsulation or disposal of Lead-Based Paint and related residues by chemical or mechanical means and the use and manning of all tools and machinery used in the removal or transportation of Lead-Based Paint and residue.

The work task shall include, but not be limited to the erection, moving, servicing, and dismantling of all enclosures. loading, unloading, set up equipment normally used in the handling, control, removal or disposal of asbestos and Lead-Base Paint; the bagging, cartoning, crating and otherwise packaging of materials for disposal and the decontamination of all tools, equipment, and personnel on site for toxic chemicals, waste, lead and asbestos.

**Paragraph 4(d)** All such other work as traditionally performed in the construction industry by Laborers, including the operation of bobcats, forklifts, uniloaders, mechanized scaffolding, water blasting, tending other trades and such tasks as set forth in the Laborers' Manual of Jurisdiction.

**Paragraph 5. Use Of Tools:** Operation of all hand, pneumatic, electrical, motor, combustion or air-driven tools or equipment necessary for the performance of work described herein.

**Paragraph 6. Miscellaneous:** All such work and jurisdiction as may have been acquired by reason of amalgamation or merger with former national or international Unions and as may be hereafter acquired.

### Article 18
### ALCOHOL AND SUBSTANCE ABUSE

**Paragraph 1.** The EMPLOYER and the UNION agree to the Substance Abuse and Recovery Program as described in this Article and further agree that EMPLOYER may only implement a policy regarding drug and alcohol abuse to the extent that it complies with the Program as described in this Article.

**Paragraph 1(a).** That the pre-employment lung capacity test required by the Environmental Protection Agency shall not include a drug test or screen.

**Paragraph 2.** It is further agreed that there will be established a Joint Committee on Substance Abuse and Recovery, which will be made up of three persons selected by the UNION and three persons selected by the Associations. This Committee shall meet on the request of any two members at reasonable times and places, no less often then quarterly. The Committee shall be empowered, upon the affirmation vote of 5 members of the Committee, to modify the drug and alcohol testing policy created herein which shall become binding upon the parties to this Agreement, provided sixty days written notice has been served on the UNION and the Association, and provided, however, that it shall take effect as to the employees of members of each Association only if such Association does not register its disagreement in writing with the UNION within thirty days of being notified.

**Paragraph 3.** The parties recognize the problems created by drug and alcohol abuse and the need to develop prevention and treatment programs. EMPLOYER and the UNION have a commitment to protect people and property , and to provide a safe working environment. The purpose of the program described in this Article is to establish and maintain a drug free, alcohol free, safe, healthy work environment for all of the employees covered by this Agreement.

**Paragraph 4(a).** For the purpose of this Article, the phrase "Prohibited Substances" shall mean and include any illegal drugs, controlled Substances (other than prescribed medications),

lookalike drugs, designer drugs and alcoholic beverages.

**Paragraph 4(b).** For the purpose of this Article, the term Jobsite shall include that portion of the site on which construction or construction related activities is taking place as well as that portion of the site or project which is used for parking and shall also include automobiles, trucks and other vehicles owned or leased by the EMPLOYER or the Employer's office, shop or yard.

**Paragraph 5.** It is recognized that there are certain medications which may impair the performance of job duties and mental and/or motor functions. In such cases, with the permission of an Employee and after consultation with such Employee's physician or other physician, the Employer shall attempt to accommodate an Employee by reassignment to a job compatible with the administration of such medication.

**Paragraph 6.** An Employee who is involved in the sale, possession, purchase or distribution of Prohibited Substance on the jobsite may be subject to termination. An Employee who used a Prohibited Substance on the jobsite or is determined to be under the influence of Prohibited Substance on the jobsite, may be terminated.

**Paragraph 7.** Except as provided herein, no pre-employment screening shall be permitted and no random testing shall be permitted. An Employer may require pre-employment drug and alcohol testing at the Employer=s option, and testing in the manner required by individual project specifications, provided that employees who have not worked for an Employer for thirty (30) days are regarded as new employees for pre-employment testing purposes. The Employer shall advise the Union of projects whose specifications require testing prior to the commencement of such testing (other than pre-employment testing), and employees wrongfully denied employment as a result of a breach of these provisions are entitled to an award of lost pay as a result of such breach.

**Paragraph 8.** An Employee involved or injured in a workplace accident may, at the discretion of the EMPLOYER, be required to submit to a drug test.

**Paragraph 9.** It is agreed that under certain circumstances, an Employee whose work performance and/or behavioral conduct indicated that he or she is not in a physical condition that would permit the Employee to perform a job safely and efficiently will be subject to submitting urine, blood or breathalyzer test to determine the presence of alcohol or drugs in the body, provided:

(a)    The EMPLOYER has reasonable grounds to believe that the Employee is under the influence of or impaired by the use of Prohibited Substances. Reasonable grounds include abnormal coordination, appearance, behavior, speech, odor or any detectable amount of a Prohibited Substance. It can also include work performance.

(b)     The supervisor's reasonable grounds must be confirmed by another management representative in conjunction with a representative of the UNION, which may be the Business Representative, Job Steward or Union Safety Representative if immediately available. Both management representatives describe such grounds in writing prior to any testing being directed.

(c)     The Employee will be provided with an opportunity to explain his or her conduct at a meeting with the Representatives, including the UNION Representative referred to in Section 8(b), provided that such UNION Representative is reasonably available and provided further that all reasonable efforts have been made to attempt to have such UNION Representative present.

**Paragraph 10.** An Employee who refuses to submit to a test requested pursuant to Section 8 shall be offered the option of enrolling in a Member Assistance Program (MAP). In the event the employee elects to enroll in MAP such employee may be placed on an unpaid leave of absence. In the event the Employee refuses to do either, he shall be subject to termination.

**Paragraph 11.** Drug testing shall take place at a recognized medical facility or certified independent laboratory at the expense of the EMPLOYER.

**Paragraph 12.** When a test is required, the specimen will be identified by a code number, not by name, to insure confidentiality of the donor. Each specimen contained will be properly labeled and made tamper proof.

**Paragraph 13.** The handling and transportation of each specimen will be properly documented through the strict chain of custody procedures.

**Paragraph 14.** Any urine sample taken for testing shall be tested as follows:

(a) For screening; and

(b) In the event the screening test is positive, for confirmation testing by gas chromatograph/mass spectrophotometry (GC/MS). This test will be on a separate specimen other than the original specimen used at the initial screening. The initial test shall be paid for by the employer. Any subsequent retest shall be on a separate specimen and shall be paid by the requesting employee and shall be conducted within two (2) working days of the employee's notification of the positive test result.

**Paragraph 15.** Drug testing shall only be conducted by CAP or NIDA certified independent laboratory.

**Paragraph 16.** The EMPLOYER, all of his medical personnel, and the personnel of the laboratory/testing facility shall adhere to the American Occupational Medical Association's Code of Ethical conduct for Physicians Providing Occupational Medical Services and to the AOMA Drug Screening in the Workplace Ethical Guidelines.

**Paragraph 17**

(a) An employee undergoing testing shall be placed on an unpaid leave of absence pending the results of the screening test.

(b) In the event that the results of the screening test are negative, the Employee shall be paid for all time involved in the testing process. In the event that the results of the screening test are positive, there shall be confirmation testing as described in Paragraph 14(b) above. In the event the results of the confirmation testing are negative, the Employee shall be reinstated without backpay. Unless an initial positive result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such.

(c) In the event that the results of the confirmation testing are positive, the Employee will be given the opportunity to enroll in a recognized Member Assistance Program. In the event such employee declines to participate in the MAP, he shall be subject to termination.

**Paragraph 18**

(a) An Employee who fails to cooperate, abandons or does not complete the treatment program prescribed by the MAP counseling or who fails to live up to the terms and conditions of the Referral Agreement will be subject to termination.

(b) If treatment necessitates time away from work, the EMPLOYER shall provide for the Employee an unpaid leave of absence for purposes of participation in an agreed upon treatment program. An Employee who successfully completes a rehabilitation program shall be reinstated to his or her former employment status, if work for which he or she is qualified exists.

(c) In order to ensure confidentiality in the MAP program, the EMPLOYER shall designate a Management Employee as the Employee Assistance Representative for the EMPLOYER. This individual shall be the sole representative of the EMPLOYER who is in possession of Employee MAP information. This person shall be of at least the level of Job Superintendent.

(d) Whenever Owner or Awarding Agency specification require the EMPLOYER to provide a drug-free workplace, such additional requirements may be incorporated herein upon mutual agreement of the UNION and the EMPLOYER.

## Article 19
## ACCRETIONS AND SUCCESSORS

(a) ACCRETIONS This Agreement shall apply to all present and subsequently acquired operations of the Employer and to all accretions to the bargaining unit, including but not limited

to newly established or acquired operations.

(b) SUCCESSORS  This Agreement and any supplemental or amendments thereto, hereinafter referred to collectively as "agreement," shall be binding upon the parties hereto, their successors, administrators, executors and assigns.

In the event the Employer's business is, in whole or in part, sold, leased, transferred, or taken over by sale, transfer, lease, assignment, receivership, or bankruptcy proceedings, such business and operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof.

It is understood by this provision that the parties hereto shall not use any leasing or other transfer device to a third party to evade this Agreement.  The Employer shall give notice of the existence of this Agreement and this provision to any purchaser, transferee, lessee, assignee, etc., of the business and operation covered by this Agreement or any part thereof.  Such notice shall be in writing with a copy to the Union, at the time the seller, transferor, or lessor executes a contract or transaction as herein described.  The Union shall also be advised of the exact nature of the transaction, not including financial details.

In the event the Employer fails to require the purchaser, transferee, or lessee to assume the obligations of this Agreement, the Employer (including partners thereof) shall be liable to the Union, and to the employees covered for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, but shall not be liable after the purchaser, transferee, or lessee has agreed in writing to assume the obligations of this Agreement.

## Article 20
## ADJUSTMENT OF DISPUTES

**Paragraph 1.**  Any dispute concerning the interpretation or application of this Agreement between an Employer and the Union shall be adjusted by the particular Employer and Union, in the first instance.

**Paragraph 2.**  In the event that the matter is not settled, the Union may file a written grievance with the Employer, provided that the grievance is filed no later than the later of ninety (90) days after the events giving rise to the grievance or forty-five (45) days after the Union or the affected employees knew about the events giving rise to the grievance, whichever is sooner. The grievance shall be submitted to a JOINT ADJUSTMENT BOARD (hereafter the JAB ) comprised of three (3) Employer representatives selected by the Illinois Environmental Contractors Association and three (3) Union representatives selected by the Construction and General Laborers District Council of Chicago and Vicinity.  The JAB shall convene on a monthly basis if there are grievances pending, on a regular date mutually selected.  Grievance decisions of the JAB shall be by majority vote, provided that the Employer representatives and Union representatives shall have equal voting power.  If decided by majority vote, the grievance

decision and any relief determined to be appropriate shall be final and binding upon all parties. The Union will make its best efforts to resolve grievances prior to submitting them to the JAB.

In cases of wage audits, the time limits for filing grievances begins to run upon the issuance of the audit; provided, that if an initial wage audit shows delinquencies of less than $2,500 per year of the audit, the Union may not re-audit the same Employer for wages for the same time period except with prior approval from the JAB.

**Paragraph 3.** In the event that the JAB is deadlocked upon the disposition of a grievance, then the Employer or the Union may refer the matter to a neutral arbitrator by so notifying the other within thirty (30) days of the deadlock. The moving party shall obtain a list of seven (7) arbitrators from the Federal Mediation and Conciliation Service, provided that all arbitrators on the list must maintain their principal office within the State of Illinois and must be members of the National Academy of Arbitrators. The parties shall alternatively strike arbitrators from the list, with the party striking first to be determined by a coin flip, until one arbitrator remains.

**Paragraph 4.** The decision of the arbitrator shall be final and binding upon the Employer and the Union. The arbitrator shall not be empowered to amend, alter or add to this Agreement. The arbitrator s expenses shall be paid by the Employer if the grievance is sustained in whole or in part and shall be paid by the Union if the grievance is denied.

**Paragraph 5.** The Union=s legal fees and costs incurred in enforcing the majority decisions and awards of the JAB or an arbitrator are chargeable to, and will be paid by the party against whom the decision is rendered. Such fees and costs shall not include those in connection with the Union=s unsuccessful efforts to enforce said decisions and awards.

**Paragraph 6.** The Union reserves its right, and it shall not be a violation of this Agreement, for the Union to strike, picket and/or withdraw its employees from any Employer who fails to pay wages or fringe benefits as required under this Agreement.

## Article 21
## MOST FAVORED NATIONS

The Union shall not enter into a separate agreement with any employer covering the work covered by this Agreement without the prior written consent of IECA, it being the intention of the parties that all such work be performed under the full terms of this Agreement. If it is found that an employer is performing work in competition with IECA=s members under an agreement whose overall terms are more favorable to the employer than those contained in this Agreement, IECA=s members shall have the right to perform the work covered by this Agreement on those same more favorable terms on written notice to the Union. This requirement shall not apply to Project Labor Agreements, provided that they are not used to undermine the standards of this

Agreement.  Notices required under this Article shall be provided to the person(s) designated by each party.

## Article 22
## UNION PROTECTION

Notwithstanding anything in this Agreement to the contrary, the employees covered by this Agreement shall not be required to work anywhere on any job site where the Union has established a picket line or withdrawn its employees in a labor dispute.

## Article 23
## APPROVALS

**Paragraph 1.**  It is mutually agreed that the Construction and General Laborers' District Council of Chicago and Vicinity and Laborers' Local 225 shall, in writing, by an authorized officer, approve and guarantee the fulfillment of all the provisions of this Agreement.

**Paragraph 2.  Savings Clause.**  Any provisions contained herein which is contrary to or held to be in violation of any State or Federal Law shall be void and of no force or effect, and this Contract shall be construed as though such void provision were not a part hereof, it being intended that the other provisions of this Contract shall not be affected thereby.

**Paragraph 3.  Employer's Warranty.**  The signatory Association represents and warrants that it is the bargaining agent of all the individual Employers who are now or hereafter become members of said signatory Association and who assign to the signatory Association full authority to negotiate and execute this Agreement.

**Paragraph 4.  Execution.**  It is expressly agreed and understood that execution of this Agreement by an authorized representative of the signatory Association shall be conclusively presumed sufficient legal execution by all individual contractors represented by the signatory Association, and that individual executions are not required for this Agreement to be binding on such Employers.


ILLINOIS ENVIRONMENTAL
CONTRACTORS ASSOCIATION, INC.


BY:_____

     PRESIDENT

CONSTRUCTION AND GENERAL LABORERS=
DISTRICT COUNCIL OF CHICAGO AND VICINITY
for and on behalf of its affiliated Local Unions


BY: _____

     BUSINESS MANAGER


BY:_____

     PRESIDENT & SEC.-TREAS.


LABORERS LOCAL 225


BY: _____

     BUSINESS MANAGER

# EMPLOYER=S BOND

**KNOW ALL PEOPLE BY THESE PRESENTS,** that we _____

_____, a _____,
(name of employer)    (indicate corporation, partnership, or sole proprietor)

of _____, Illinois, herein called the APrincipal,@ and
(city)

_____, herein called the ASurety,@ are hereby
held
(name of bonding company)

and firmly bound unto the various fringe benefit, industry, and promotion funds identified in the collective bargaining agreement between Construction and General Laborers= District Council of Chicago and Vicinity (the ALaborers= District Council@) and the Illinois Environmental Contractors Association, Inc. and any successor collective bargaining agreements, all of which funds are collectively referred to as the AFunds@; unto the Laborers= District Council; unto the local unions that are affiliated with the Laborers= District Council, including but not limited to Laborers= Local 225 (the ALocal Unions@); and unto all individuals employed by the Principal and represented for collective bargaining purposes by the Laborers= District Council and the Local Unions, referred to as the AUnion Employees@ (the Funds, the Laborers= District Council, the Local Unions, and the Union Employees are collectively referred to as the AObligees@) in the penal sum of **fifty thousand Dollars ($50,000.00),** for the obligations and undertakings hereinafter set forth, for the payment of which, well and truly to be made, we hereby jointly and severally bind ourselves, our successors, assigns, heirs, executors, and administrators.

Signed and sealed and dated on this _____ day of _____, 20_____.

WHEREAS, the above named Principal is employing or proposes to employ employees in a bargaining unit represented by the Laborers= District Council for the purpose of performing certain work as defined in a collective bargaining agreement between the Principal and the Laborers= District Council;

NOW, THEREFORE, the conditions of this bond are such that if the Principal shall well and faithfully pay the wages due the Union Employees with respect to the work performed by the Union Employees, the contributions due the Funds, the contributions due the Industry Education Fund, the dues due the Laborers= District Council and the Local Unions, and such other amounts as the Principal may be required to pay to the Obligees, or to any of them, pursuant to the collective bargaining agreement between the Principal and the Laborers= District Council, then this obligation shall be void; otherwise the same shall remain in full force and effect.

If Surety is required to make payment to the Obligees pursuant to the bond, Surety shall have no claim or right of any sort against Obligees.

In the event that the aggregate amount due the Obligees shall exceed the amount of this bond, then the claims of the various Obligees shall be satisfied on a *pro rata* basis, proportionate to the amount of each Obligee=s claim. Any disputes as to the proper distribution in such circumstances, and any disputes regarding the Principal=s obligations to the Obligees, shall be resolved in accord with the dispute resolution mechanisms of the collective bargaining agreement between the Principal and the Laborers= District Council.

If the Surety fails without good reason to make payment on a valid claim within 30 days of being presented with such claim and reasonable support for it, or fails without good reason to make payment within such additional time as may be found proper, Surety will be liable to Obligees for interest at the then applicable rate on all payments and if the Obligees file suit to obtain payment from Surety and prevail in such a suit, Surety shall reimburse the Obligees for all reasonable legal fees and costs. If Surety is required to pay interest or to reimburse legal fees and costs pursuant to this provision, such payment will not be treated as reducing the amount of Surety=s obligation on this bond.

This Bond may be canceled by the Surety 120 days after receipt by the Obligees of the Surety=s written notice of cancellation by registered mail, and the requirement for service on the Obligees shall be deemed satisfied if such service is made on both the Business Manager of the Laborers= District Council and the Business Manager of Laborers= Local 225.

PRINCIPAL (indicate corporation, partnership, or sole proprietor)

By: _____

Principal=s authorized agent

ATTEST:

SURETY

32

By:

Surety=s authorized agent